IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |   |
|---|---|---|
| **JOHN AND CHER, INC.,** | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. 1:18-cv-02887-SAG |
| **HOWARD BANK,** | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff John and Cher, Inc. ("Plaintiff") filed this case asserting that Defendant Howard Bank ("Defendant") violated the terms of an agreement between the parties. ECF 1. Discovery is now concluded, and Plaintiff has filed a Motion for Summary Judgment ("the Motion"), ECF 49. Defendant has opposed that Motion and filed its own Cross-Motion for Summary Judgment in response, ECF 54. I have reviewed the Motions and related responses and replies, along with the accompanying exhibits. ECF 55, 57. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, Plaintiff's Motion will be granted in part and denied in part. Defendant's Motion will be denied.

### I.  FACTUAL BACKGROUND

The facts relevant to this contractual dispute are as follows. Plaintiff offers products and services related to banking overdraft fees. Plaintiff and Defendant entered into a written agreement in late September 2015 (the "Agreement"), in which Plaintiff agreed to provide certain services and technology to Defendant relating to the overdraft program Defendant offered to its customers. ECF 51-6 at 125-141. Plaintiff's overdraft-related services (the "Overdraft Fee Program" or "ODFP") included a campaign to send letters and disclosures to Defendant's customers to

encourage their use of overdrafts (thus generating fees for Defendant), as well as technology that monitored the overdraft income Defendant received each month. *Id.* The Agreement provided that Plaintiff would be paid a percentage of the monthly increase in overdraft income realized above a baseline figure for a period of 36 billing months. *Id.* It also contained provisions outlining how the Agreement would be affected by possible future mergers and acquisitions by/of Defendant and how Defendant could end the Agreement, which was set to last through September 2019. *Id.*

In August 2017, Defendant announced that it would merge with another financial institution, First Mariner Bank, in early 2018. ECF 51-6 at 41-43. Defendant would be the surviving entity from the merger. ECF 54-5 at 17. Following the merger's announcement, Defendant engaged in a review of services offered by its third-party vendors, including Plaintiff's ODFP. ECF 54-3 at 8-9. During this time, Plaintiff and Defendant negotiated a new "baseline" that would apply if Defendant chose to expand the ODFP to the new accounts added as a result of the merger with First Mariner Bank, ECF 54-5 at 12; ECF 54-10 at 15-16, though the parties dispute whether the creation of that baseline was merely a thought exercise or a commitment to actually using the ODFP for the new, post-merger accounts. Notably, Defendant's final payment to Plaintiff for its use of the ODFP, which covered the month of May 2018, was $7,388, ECF 51-16 at 33—an amount more than double the previous month's commission and, according to Plaintiff, based on the new baseline for income that included the First Mariner Bank accounts.

Also in May 2018, Defendant sent a letter to Plaintiff purporting to terminate the Agreement and cease its use of the ODFP with 16 billing months remaining on the contract. ECF 51-16. Following termination, Defendant attempted to buy out those remaining months using the buyout formula set in the contract, sending Plaintiff a check in the amount of $85,833.75. Plaintiff rejected the buyout payment. *See* ECF 54-16. Following the termination of the Agreement and

attempted buyout, at least one employee of Defendant continued sending ODFP-related materials to certain account holders, ECF 54-13 at 3. However, the parties dispute how long Defendant continued to use the ODFP materials post-termination and whether the ODFP materials were sent to any new, former First Mariner account holders or only to Defendant's pre-merger account holders.

## II.     LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving

party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

"In an action based upon diversity of citizenship, a federal court must apply the substantive law of the state in which it sits, including that state's choice of law rules." *Bolden-Gardner v. Liberty Mut. Ins. Co.*, No. RDB-19-3199, 2021 WL 22419, at *2 (D. Md. Jan. 4, 2021) (citations omitted). Maryland courts generally enforce choice-of-law provisions in contracts unless (1) the state the parties designated in the contract does not have a substantial relationship to the parties or the transaction at issue; or (2) the strong fundamental public policy of the forum state prohibits application of the chosen law. *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 659 A.2d 1295, 1301 (Md. 1995). Here, the Agreement in question has a Maryland choice-of-law provision. ECF 51-6 at 136. With that in mind, the parties appear to agree that Maryland law controls the dispute. *See* ECF 51-2 at 17; ECF 54-1 at 16.

### III.  ANALYSIS

#### A.  Breach of Contract

The parties agree that whether Defendant breached the contract when it opted to end its relationship with Plaintiff and offer a buyout is a question of contractual interpretation that can be

4

determined as a matter of law by the Court. *See* ECF 51-2 at 14, ECF 54-1 at 11. Under Maryland law, to sustain a breach of contract claim, "a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001). There are three key contractual provisions here that potentially govern the parties' conduct regarding Defendant's merger with First Mariner Bank and its subsequent decision to end its relationship with Plaintiff. First, there is the "Acquisition Provision," which states:

> In the event Howard Bank acquires or merges as survivor with another financial institution and shares any recommendations or materials or software either in their original or modified form, then a new baseline will be established for the new accounts according to the Quantification of Earnings section herein and Howard Bank agrees to compensate John M. Floyd & Associates beginning on the date of the merger or acquisition for a period equal to the remaining months of the original billing period set forth in the Cost of Engagement section herein.

ECF 51-6 at 128. Immediately following that provision, the contract outlines the possibility of a buyout in certain circumstances (the "Buyout Provision"):

> In addition and subject to the terms of this agreement, if Howard Bank is acquired by or merges with another financial institution, the acquiring, surviving institution shall be permitted continued usage of John M. Floyd & Associates' Overdraft Privilege Program including its software, written materials, recommendations or any of its other proprietary intellectual property for only those Howard Bank members that existed prior to the time of the merger. Furthermore, the acquiring institution also agrees to fulfill the full term of the existing Howard Bank contract with JMFA. This will be accomplished by adhering to the existing contract terms and conditions and paying all amounts due as agreed. As an alternative, the acquiring institution may buyout the remaining value of the contract. The value of the contract will be determined by the following method: The acquiring institution agrees to pay an amount equal to the monthly average of the preceding 12 months of invoices paid to JMFA times the remaining billing months left on the contract.

*Id.* at 128-29.

The final relevant contract term is the "Termination Provision," which states that "Howard Bank may discontinue offering [the ODFP] at any time, but agrees to pay [Plaintiff] according to

5

the 'Cost of Engagement' section herein for a period equal to the remaining months of the original billing period . . . ." *Id.* at 136. Other than the aforementioned "Buyout Provision," this is the only other relevant mechanism for Defendant to terminate its contractual obligations.

Defendant suggests that, when it acquired First Mariner Bank in late 2017, it had the option of following *either* the "Acquisition Provision" or the "Buyout Provision," ultimately choosing to invoke the latter and exit the agreement. Plaintiff, on the other hand, contends that the "Buyout Provision" applied only to situations where Defendant was acquired or otherwise was not the surviving entity post-merger. Thus, it was not applicable to Defendant's acquisition of First Mariner. By this reading, then, Defendant's attempted buyout was invalid—because its only choices were to follow the "Acquisition Provision," or, if it wished to end its relationship with Plaintiff, the "Termination Provision" instead.

Maryland subscribes to an objective interpretation of contracts. *See Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 448 (2008). The Court must consider "what a reasonable person in the position of the parties would have thought [the language] meant," not "what the parties thought that the agreement meant or intended it to mean," and it "must presume that the parties meant what they expressed." *Calomiris v. Woods*, 353 Md. 425, 436 (Md. 1999) (quoting *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985)). Where valid contractual language is unambiguous, its plain meaning is enforced. *Allegis Group, Inc. v. Jordan*, 951 F.3d 203, 210 (4th Cir. 2020) (citing *Cochran v. Norkunas*, 919 A.2d 700, 709 (2007) ("If the language of a contract is unambiguous, we give effect to its plain meaning…"). Courts construe contracts as a whole and give effect to the language as written. *Plank v. Cherneski*, 231 A.3d 436, 476–77 (Md. 2020). Moreover, courts consider the contract language in its "'customary, ordinary, and accepted meaning.'" *Id.* (quoting *Fister v. Allstate Life Ins. Co.*, 783 A.2d 194, 199 (Md.

6

2001). Underlying all of this is a bedrock principle that "Maryland courts consistently strive to interpret contracts in accordance with common sense." *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 397 (2019) (internal quotations omitted).

Defendant asserts that the "Buyout Provision" unambiguously covers its merger with First Mariner because it applies, in part, where it "merges with" another institution. ECF 54-1 at 10. While it is true that "merges with" could, in a vacuum, be interpreted to mean a merger where Defendant was the surviving entity, the context of the rest of the "Buyout Provision" and the contract as a whole forecloses this reading. First, the "Buyout Provision" states that "the acquiring, surviving institution" would be permitted to continue using the ODFP and "agrees to fulfill the full term of the existing Howard Bank contract . . . ." ECF 51-6 at 128-29. To read such language as covering mergers in which Defendant is the surviving entity would render much of this language superfluous, given that it was already entitled to use the ODFP and was bound to follow the terms of the contract.[1] *See Calomiris v. Woods*, 727 A.2d 358, 366 (Md. 1999) (holding that Maryland courts interpret contracts to avoid superfluity). Such language is, instead, targeted at ensuring that some other surviving institution will maintain Defendant's commitment to the agreement, as opposed to simply reiterating the obvious fact that Defendant itself must adhere to the contract it agreed to in the first instance. This language implicitly distinguishes Defendant from the surviving institution the "Buyout Provision" contemplates.

Additionally, adhering to Maryland law's mandate that courts consider the contract as a whole, this reading of the contract is supported by a careful comparison of the "Acquisition" and

---

[1] The superfluity of this reading is highlighted by inserting Howard Bank, the post-merger survivor, into the "Buyout Provision" language, for example: "Howard Bank agrees to fulfill the full term of the existing Howard Bank contract."

"Buyout" provisions at issue. The "Acquisition Provision" specifies that it applies to Defendant "acquir[ing]," or "merg[ing] as survivor" with, another financial institution, while the "Buyout Provision" contemplates Defendant being "acquired by or merg[ing] with" another financial institution, leaving out the language specifying Defendant "as survivor." ECF 51-6 at 128-29. Common sense dictates that there is a substantive difference between acquiring and being acquired, and that same logic supports the notion that contract language specifying merging "as survivor" versus simply "merging with" mean different things too. The contract drafters evidently knew how to specify a situation in which Defendant merged as a survivor, as articulated in the "Acquisition Provision. The omission of equivalent language in the "Buyout Provision" indicates that the drafters did not intend for it to cover mergers in which Defendant was the survivor. *See Booth v. State*, 306 Md. 313, 327 (1986) (interpreting contested language in part based on the fact that the language's drafters demonstrably knew how to use certain language and failed to do so in other areas). This distinction is further confirmed by the fact that the "Acquisition Provision" specifically names and contemplates the responsibilities of Defendant as the surviving institution, whereas the "Buyout Provision" only refers to the duties of an unnamed "acquiring, surviving institution" without identifying Defendant at all. ECF 51-6 at 128-29.

Lastly, the "Buyout Provision" contains language that forecloses the possibility of it being used in scenarios covered by the "Acquisition Provision." The "Buyout Provision" states that the acquiring, surviving institution may *only* use the ODFP in relation to accounts for Defendant members that existed prior to the merger, whereas the "Acquisition Provision" contains language allowing Defendant to incorporate new, post-merger accounts into the ODFP by establishing a new baseline. *Id.* It is therefore impossible for Defendant's reading—that both provisions applied to the merger with First Mariner such that it had an option as to which provision to follow—to be

correct. *See Catalina Enterprises, Inc. Pension Tr. v. Hartford Fire Ins. Co.*, 67 F.3d 63, 66 (4th Cir. 1995) ("It is axiomatic under Maryland law that a court should avoid reading a contract in a way that produces an absurd result, especially when a reasonable interpretation is available."). It would produce an absurd result were they read to both cover the merger with First Mariner, because it would mean that Defendant both had the option of sharing ODFP materials with First Mariner customers under the "Acquisition Provision" but also was limited to continue using the ODFP for *only* pre-merger customers under the "Buyout Provision." Such inconsistencies can be entirely avoided by an alternative, eminently reasonable interpretation that comports with the plain language and context of the contract as outlined in the preceding paragraphs—namely, that the "Buyout Provision" and "Acquisition Provision" apply in distinct situations based on whether or not Defendant was the post-merger surviving entity. Since Defendant was the post-merger survivor here, the "Acquisition Provision" controlled and the "Buyout Provision" did not apply. Its exit from the agreement via attempted invocation of the "Buyout Provision," instead of the "Termination Provision," was therefore a breach of the contract.

### B. Damages

Having determined that Defendant breached the contract, the next step of the analysis is to determine damages for the breach. The "Termination Provision"—which Defendant improperly sought to avoid by offering a buyout pursuant to the inapplicable "Buyout Provision"—specifically states that, in the event of termination, Defendant must compensate Plaintiff "according to the 'Cost of Engagement' section herein for a period equal to the remaining months of the original billing period . . . ." ECF 51-6 at 136. This would be straightforward enough, but for the fact that the parties dispute whether such compensation should include the significant number of new accounts brought into the fold as a result of Defendant's acquisition of First Mariner Bank.

Resolution of that dispute hinges on whether Defendant used the ODFP with the new First Mariner Bank accounts it acquired—if so, then the "Acquisition Provision" mandates that a "new baseline" including those First Mariner accounts be established for the purposes of determining Plaintiff's compensation. If Defendant did not share any ODFP materials, on the other hand, then the termination fee would simply be based on the pre-merger level of fees garnered by Plaintiff.

There is, ultimately, a question of fact as to whether Defendant actually used ODFP materials in relation to the new, formerly First Mariner accounts post-merger in a way that would require payments to be made under the "new baseline" pursuant to the "Acquisition Provision." Plaintiff relies upon the fact that Defendant helped establish an updated baseline including the new First Mariner accounts, but Defendant points to deposition testimony stating that the creation of the updated baseline was part of a cost-benefit analysis meant to explore whether it was worth continuing to use the ODFP going forward post-merger, *see, e.g.*, ECF 54-5 at 12; ECF 54-10 at 12, 15-16. Plaintiff suggests that this argument that the new baseline was merely for cost-benefit purposes rings hollow, in light of the fact that Defendant entered First Mariner account information into Plaintiff's proprietary ODFP system in May 2018, more than doubling the number of accounts entered the previous month, before deleting that information from the ODFP system in early June. Despite this deletion, Defendant appears to have paid Plaintiff in May 2018 using the new baseline—resulting in a commission that was more than double its previous fees, allegedly reflecting the newly generated income resulting from the First Mariner accounts' inclusion. *See* ECF 51-16 at 33. However, the fact of this payment (as well as the seemingly related ODFP data entry and subsequent deletion) is merely circumstantial evidence of use of ODFP on the First Mariner accounts, because the invoice itself says nothing about new accounts, how the fee was generated, or Defendant's rationale for paying it. *Id.* Thus, the dramatically larger invoice alone

10

is not determinative in light of the explicit testimony that Defendant did not incorporate First Mariner accounts into JCI's overdraft program, ECF 54-5 at 8-9, 13, as well as testimony from Plaintiff's own witnesses that they were unsure about Defendant's decision with regard to the First Mariner accounts, *see* ECF 54-3 at 10, 11.  A reasonable fact finder could rely upon all of this testimonial evidence to conclude that, irrespective of the May 2018 check and the database entries, Defendant was genuinely still undecided as to whether to use the ODFP program on First Mariner accounts when it helped establish the new baseline and that it never actually used any ODFP materials with First Mariner customers.  While Plaintiff's evidence may be enough to carry the day at trial, it does not meet the high bar of showing "no genuine dispute as to any material fact," when the evidence must be viewed in the light most favorable to Defendant.

The parties also disagree over how to interpret the contract's late fees provision, which states that "[a]ny fees owed to [Plaintiff] which are not paid by the 15th day of the month in which they are due, shall be considered past due and the client agrees to pay late fees of one and one-half percent (1 1/2%) of the amount which is past due or $500.00, whichever is greater."  ECF 51-6 at 133.  Defendant asserts that this provision only requires a single payment—of either $500 or 1.5 percent of the past-due amount—per month for each month that late payments are outstanding. [2] Plaintiff, on the other hand, suggests that late fees should be assessed per payment, per month—in other words, a missed payment would accrue another $500 in late fees every month that particular payment is outstanding, as would every other missed month of payment individually.

---

[2] Plaintiff interprets Defendant's late fees argument to mean that "a party to a contract could never pay its bills and simply dispense with its obligation to do so by paying *one* late fee of $500 at a time of its choosing years later."  ECF 55 at 19.  That is not how the Court interprets Defendant's position, but to the extent that it *is* what Defendant meant to suggest, the Court rejects that conclusion in favor of its interpretation proffered below.

11

The contract's plain language supports Defendant's reading of the provision. Nothing in the terms suggests that Plaintiff is entitled to separate sets of late fees for each subsequent month's missed payment. Instead, the contract refers to a single "amount which is past due," which naturally includes any previous missed payments, along with attendant late fees. Plaintiff is correct that the late fees provision references "fees," plural, rather than a singular "fee," but that actually comports with the Court's interpretation of the provision here, in which multiple late fees continue to accrue over time and are incorporated into the total "amount which is past due" each month.[3] With this in mind, every month, the amount of late fees owed for that month will be $500 or 1.5% of the "amount which is past due" (including previous missed payments and late fees), whichever is greater.[4]

Lastly, the contract includes a provision providing for attorneys' fees: "[i]f legal action is necessary to enforce this agreement or collect any amounts owing under this agreement, the prevailing party has the right to payment by the other party of all attorney's [sic] fees and costs, including fees on any appeal and any post-judgment collection actions." ECF 51-6 at 135. There appears little room for debate that attorneys' fees are warranted under the terms of the contract, since Plaintiff had to turn to the Court to successfully enforce its agreement. Defendant anticipatorily characterizes Plaintiff's claim for fees as "exorbitant" but cannot support that claim,

---

[3] Defendant also suggests that any late fees at all are inappropriate since it timely tried to pay Plaintiff in August 2018 pursuant to its calculations under the "Buyout Provision." ECF 54-1 at 24. However, as outlined in Section III(A), this attempt to invoke the "Buyout Provision" was erroneous and Plaintiff was within its rights to reject the invalid payment. Defendant's assertion that a misguided attempt to make an incorrect payment somehow obviates the need to pay late fees is unpersuasive.

[4] In light of this interpretation, the parties will be directed to calculate the relevant late fees and to confer regarding their respective calculations under this formula. If unable to reach an agreement on the amount due, the parties may submit their respective calculations to this Court for review.

since there has not yet been any submission suggesting a specific amount of fees sought.  ECF 57 at 8-9.  If Defendant believes Plaintiff's ultimate fee request is actually exorbitant, it can challenge the calculations at that time.

### IV.     CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment, ECF 49, will be GRANTED as to the breach of contract claim but DENIED as to damages.  Defendant's Cross-Motion for Summary Judgment, ECF 54, will be DENIED.  A separate Order follows, which will include information about a teleconference to discuss further scheduling in this case.


Dated:  June 2, 2021                                                    /s/
                                                                Stephanie A. Gallagher
                                                                United States District Judge